## No. 227.

## C. C. WALKER vs. THE VICKSBURG, SHREVEPORT AND PACIFIC RAILROAD COMPANY.

1. While it is the duty of a railroad company to stop its train at the station to which it has contracted to carry a passenger and to land him safely conveniently. yet the fact that the company neglects this duty and the train passes the station without stopping, does not justify a passenger in jumping from the moving train, unless expressly or impliedly invited to do so by the employees of the company.

2. The plaintiff's act in jumping from the moving train was purely voluntary, uninfluenced by any invitation expressed or intended by the company's employees, and excusedly no im-

pending danger or necessity of any kind except his simple unwillingness to be carried beyond his destination; it was imprudent and dangerous, and his action for resulting injury is barred by his own contributory fault.

APPEAL from the Second District Court, Parish of Webster. Drew, J.

*Watkins & Watkins* for Plaintiff and Appellee:

An action for damages for injuries suffered by a passenger on a railroad is one *ex-contractu*. H. D. p. 1057, No. 14; 5 La. 431, quoted by 40 Ann., p. 91.

An injury must be repaired by him whose fault caused it. R. C. Code 2315; 17 Ann. 19, giving $25,000 for similar injuries; 23 Ann. 180. giving $15,000 damages; 34 Ann. 139, allowing $7,500 for a broken arm; 38 Ann. 777, allowing $10,000 for loss of an arm.

It is negligence in a railroad company not to stop its train at a station long enough for a passenger to alight. 37 Ann. 705, Lehman vs. La. Western R. R. Co., 35 Ann. 202, Wardle vs. N. O. R. R. Co.; Wood's Railway Law, Vol. 2, p. 1126.

It is not contributory negligence for a passenger to alight from a train in slow motion when impliedly invited by the railroad company to do so, when he has arrived at the station for which he is destined. 86 Tenn. (2d Pickle 343), Louisville and Nashville R. R. Co. vs. Stacker; 15 Lea, 254, 258, East Tenn. etc. R. R. Co. vs. Conner; Wood's Railway Law, vol. 2, pp. 1126, 1128, 1129 and 1130; 37 Ann. p. 705. Lehman vs. La. Western R. R. Co.; 35 Ann. 202, Wardle vs. N. O. R. R. Co.; 22 Ann. 603, Howell vs. St. Charles St. R. R. Co.; Abbott's Digest Law of Corporations, Vol. 2, pp. 598, Secs. 1010, 1011 and 1013, quoting numerous authorities.

Railroad companies are responsible for damages caused by their trains not being properly equipped. Wood's Railway Law, 1073, 1078 and 1069; 40 Ann. 178; 39 Ann. 649; 37 Ann. 648; 10 Ann. 33; 37 Ann. 650, 694, 630; 35 Ann. 751; 34 Ann. 777; 38 Ann. 111.

The verdict of the jury should not be disturbed unless clearly erroneous. R. C. C., 1934, Sec. 3; 20 Ann. 25; 18 Ann. 26; 17 Ann. 19; 37 Ann. 655; 10 Ann. 33; 38 Ann. 777; 39 Ann. 656.

The question of negligence is a proper one for the jury to decide where there is a conflict of evidence. Wood's Railway Law, Vol. 2, pp. 1259, 1257, 1126, 1127.

*T. J. Kernan* and *Farrar, Jonas & Kruttschnitt* for Defendant and Appellant.

The opinion of the Court was delivered by

FENNER, J. The following are the facts disclosed by the record:

On the 16th of October, 1886, plaintiff was a passenger on defendant's train, having purchased a ticket from Bodeau Station to Doylene Station. The latter is a flag-station at which trains do not stop unless they have a passenger to put off or take on. If a signal is given from the station that there are passengers to get on, the engineer blows two whistles to signify intention to stop. If there are passengers to put off, the conductor notifies the engineer by pulling the bell-rope, and the engineer, on receiving such signal, blows two whistles to signify the

same intention. If there are no passengers to take on or put off, only one whistle is blown and the train does not stop, but simply slackens speed to a rate of eight or ten miles an hour in passing the station to enable the mails to be thrown on and off.

On this occasion, the train had been compelled to come almost to a stop about two hundred yards from Doylene, on account of some oxen which were on the track. It then moved forward again and the conductor, knowing he had this passenger to put off, attempted to signal the engineer with the bell-rope, but, owing to some tangle or disarrangement, could not do so. Consequently the two whistles were not blown. The conductor, the engineer and the porter all agree on this point, and that is no contradicting statement.

The porter only calls out flag-stations when there are passengers to put off and the signal to stop is blown. The plaintiff testifies that the porter did pass through the car and call out Doylene Station, but this the porter positively denies, and, considering the uncontradicted testimony that no signal to stop was given, the fact is of little importance.

The consequence was that the train passed by the station only slacking its speed, as customary, but not stopping.

The plaintiff, having several times made this trip, and knowing his station, went out on the platform for the purpose of getting off. He went down on the steps of the car, and after passing a little beyond the station platform, seeing that the car did not stop, and, as he says, supposing that it was intended that he should get off and that he could do so with safety, he stepped off while the train was moving, and he says that as he was in the act of doing so, the train accelerated its motion, giving a sudden jerk which threw him and broke his ankle, occasioning the injuries for which his present action in damages is brought.

He says that just before he stepped off, some one called to him : " Is not this your station ?" which acted in determining him to step off; but the evidence leaves no doubt that the person who asked the question was not any employe of the company.

The conductor says that, having failed to give the signal, he went through the train after passing the station, to find plaintiff, intending to back the train up to the station and put him off, but failed to find him and supposed he had gotten off when the train had stopped on account of the oxen on the track.

Under these facts, the fault of the company, in not stopping its train, cannot be disputed. It was bound under its contract to stop and safely discharge its passenger.

But did its negligent failure to discharge this duty justify the plaintiff in jumping off the moving train, or absolve him from the charge of contributory negligence which, under the settled jurisprudence of this court, is a bar to his recovery?

We consider the law to be settled by the overwhelming of authority, that while a railroad company is bound to stop its train at the station to which it has contracted to carry a passenger and to land him safely and conveniently, the fact that the train is about to pass such a station without stopping does not justify the passenger in jumping off the moving train, unless expressly or impliedly invited to do so by the company.

A leading case on the subject, which we select from a multitude of authorities, not only on account of the great lawyer who delivered it, Judge Black, but also because it has been expressly quoted and affirmed by this court, lays down the principle, in a state of facts strikingly similar to those before us, as follows: "The plaintiff below was a passenger in defendant's cars from Philadelphia to Morgan's corner. The train should have stopped at the latter place, but some defect in the bell-rope prevented the conductor from making the proper signal to the engineer, who therefore went past, though at a speed somewhat slackened on account of some switches there to be crossed. The plaintiff, seeing himself about to be carried on, jumped from the platform of the car and was seriously injured in the foot. * * Persons to whom the management of a railroad is intrusted are bound to exercise the strictest vigilance. They must carry the passengers to their respective places of destination and set them down safely, if human care and foresight can do it. * * But they are answerable only for the direct and immediate consequences of errors committed by themselves. They are not insurers against the perils to which a passenger may expose himself by his own rashness and folly. * * From these principles it follows very clearly that if a passenger is negligently carried beyond his station, where he had a right to be let off, he can recover compensation for the inconvenience, the loss of time and the labor of travelling back, because these are the direct consequences of the wrong done to him. But if he is foolhardy enough to jump off without waiting for the train to stop, he does it at his own risk, because this is gross imprudence for which he can blame nobody but himself." Penn. R. R. Co. vs. Aspell, 23 Penn. St. 147.

This court long ago laid down the like doctrine in the following language: "If the daughter of plaintiff voluntarily jumped from the cars while in motion, even though it was the constant habit of the company

to stop at that place, the leap not being made to avoid an imminent impending peril produced by the misconduct of defendants, but to avoid being carried beyond her place of destination, she was herself guilty of such imprudence as relieves the company from the consequences of the want of caution on the part of their servants; for in such a case, the accident may be attributed to the fault of both parties, which would destroy plaintiff's right to recover." And then the court quotes, with approval, the above decision of the Pennsylvania court. Dumont vs. N. O. & C. R. R. Co., 9 Ann. 441.

In a very recent case we referred to this principle as an evident one, saying :

"Now, supposing that any passenger on a regular train should labor under a similar mistake in believing, for instance, that the train was passing by the station to which he was destined, and fearing that he might be carried beyond the same, should jump out as the train was pulling out of the station, and be injured by falling, could the company be held liable for injuries thus received? Evidently not."

In the multitude of adjudications and judicial expressions on this subject by numerous courts, there have naturally arisen varieties and conflicts of opinions, and decisions, hostile or apparently hostile to each other, are quoted on either side ; but the weight of authority undoubtedly sustains the views above expressed, and, at all events, what more nearly concerns us, they have been adopted in the jurisprudence of Louisiana.

The question is, then, whether the plaintiff, in jumping off the moving train, acted upon the express or implied invitation of the company.

The evidence conclusively negatives any express invitation on the part of any employee of the company. It is equally clear that the officers in charge of the train never intended or expected that plaintiff should get off, and certainly did not slack up for the purpose of letting him get off. They acted precisely as they would have done had there been no passengers to take on or let off ; for the engineer had no signal to that effect; therefore, did not know that there was a passenger to put off; and only slackened the speed, as was his duty on all occasions, simply to allow the exchange of mails. Is it possible to construe this as implying an invitation? If so, such an invitation is given to every one who wants to get off the train, whenever it passes such a station.

The testimony is conflicting as to the rate of speed at which the train passed the station. Nothing can be more uncertain than such estimates, especially when made by unskilled observers. The natural and prob-

able conclusion from the circumstances is that the train only made the usual slacking of speed for exchanging the mails. There was no reason why the engineer should have acted otherwise. Plaintiff thinks he would have landed safely but for the acceleration of speed which took place as he was in the act of jumping. But this acceleration only took plack after the train had passed the platform and after the mails had been exchanged, which was the usual and natural course.

If plaintiff chose to infer an invitation to jump off from these customary acts of the company, it was a rash conclusion. One of his own witnesses testifies that he never, at any other time, saw a person jump from a train moving as fast as that one was, although he says it was moving slowly.

That plaintiff's action was imprudent, is shown by the result, and, as we think, by all the circumstances. His own evidence shows that he hesitated about attempting the jump, and was only determined by the question of a third person and the thought that, otherwise, he would be carried beyond his station. His act was purely voluntary, uninfluenced by any invitation expressed or intended by the employees of the company and excused by no impending danger or necessity of any kind except his mere unwillingness to be carried beyond his station. It was imprudent and dangerous, and his action for the resulting injury is clearly barred by his own contributory fault.

It is, therefore, ordered and decreed that verdict and judgment appealed from be annulled and set aside, and that there be judgment in favor of defendant rejecting the demand at plaintiff's cost in both courts.

Watkins, J. dissents and reserves the right to file his reasons.

## DISSENTING OPINION.

WATKINS, J. Plaintiff sued the railroad company for $10,000 damages for injuries he received in alighting from one of its trains while in motion, on which he was a passenger, it having *passed* the station to which he was ticketed, without making a *full stop*, only slowing up to permit an exchange of mails.

There was a verdict of a jury in his favor, which this court has set aside, and the substance of the majority opinion is: That the act of the plaintiff was voluntary, and without invitation, on the part of the officers and agents of the railroad company, and—while the company was, primarily, guilty of negligence in failing to carry out its contract of safe carriage—the plaintiff was guilty of contributive negligence, which relieves the company.

The opinion puts the proposition thus: "The question is, then,

whether the plaintiff in jumping off the moving train, acted upon the express or implied invitation of the company.;" and, answering that question, the opinion says, "the evidence conclusively negatives any express invitation, on the part of any employes of the company. It is equally clear that the officers in charge of the train never intended, or expected that he should get off."

It will be observed that the opinion does not state that the plaintiff was *not impliedly invited* to leave the train ; but that there was no *express* invitation, *on the part of any employe* of the company, and, that the *officers* in charge, *never intended, or expected* him to leave.

This *dicta* is the *sole* foundation of the opinion, and the legal proposition announced rests *exclusively* upon Damont vs. Railroad Company, 9 Ann. 441 ; Aspell vs. Railroad Company, 23 Penn. St.; and Reary vs. Railroad Company, 40 Ann. 32.

Let us see what is their purport and what are the principles they announce, and whether they are a proper foundation for the opinion.

In the Damont case none of the facts are stated. The only question discussed was the correctness of the charge of the judge *a quo* to the jury, and the case was remanded for a new trial.

The only cases cited therein, as authority, were Lesseps vs. Railroad Company, 17 La. 362, and Fleytas vs. Railroad Company, 18 La. 339. Those two cases involved claims for damages sustained by the owners of slaves who had been killed, one in attempting to cross a railroad track, and the other while lying on the track, either drunk or asleep. The mere citation of those cases as authority for the decision of *that* case, shows how imperfectly understood were the questions involved, in 1854, when that opinion was rendered; for, of course, there being between the owners of the slaves and the railroad companies no contractual relations whatever, the former were, primarily, guilty of *gross* negligence, and the latter without fault.

But the opinion quotes with approval the paragraph from Aspell vs. Railroad company, which was quoted in the Damont case; but in that extract no part of the *facts* of that case is recited.

They are brought forward in Wood's Railway Law, at pages 1130 and 1131, and we quote them, to show how *very inapplicable* to this case they are. They are as follows, viz:

" Whilst the train was in motion, the plaintiff leaped from the car, though warned by the conductor and brakeman not to do so, and who informed him that the train would be stopped and backed to the station. * * * If he had heeded them, he would have been safely set down at the place he desired to stop at, in less than a minute and a half. In-

stead of this he took a leap which promised nothing but death; for it was made in the darkness of midnight, against a wood pile close to the track, and from a car going at the full rate of ten miles an hour."

On this state of facts both the Aspell and Damont cases depend. On such a state of facts, of course, the plaintiffs were held to have been guilty of gross negligence, and the railroad companies without fault.

But why should those decisions be cited in this case as sustaining the doctrine of *contributory* negligence? I confess I cannot understand; for I respectfully submit that this record presents no such case.

Nor is the case of Reary vs. Railroad Company, at all applicable, because it was one of a little girl who received injuries in jumping from a train of cars while in motion. But she was not a passenger. The train was in the depot-yard, being uncoupled at the time, and the conductor had gone home. The paragraph quoted from that case in the opinion was hypothetically stated, merely for the purpose of an illustration, and has no weight, as a part of that decision.

Without antagonizing the opinion on its statement of facts, I propose to make an independent one.

As a witness, the plaintiff says that when within two hundred yards of the station of his departure, there was a yoke of oxen on the track, and the speed of the train was slackened until they were frightened off. Afterwards its speed was increased a little, the whistle blown, and it was reduced, and slowly moved by the depot platform while the mail was being exchanged. When the train passed the depot he thought it was running slow enough for a man to get off without danger. The only thing that prevented him getting off safely was that the train gave a jerk forward as he got off. The train was moving all the time, but very slowly. The place where he attempted to alight was a better place to get off than that where persons usually get off. The ground was smoother. The train was running at less than one-half its usual speed. When he was passing the place where the ties, etc., were lying, he thought it was not a safe place to get off. As he hurriedly made up his mind, the train passed an open place, and he got off there, because he thought it was better ground, and he could get off there without getting hurt.

Using his own language he says: "Just at the moment that I got off, the train made a jerk. I was in the act of leaving the steps when the jerk came. I had let go the railing, and had started to step in the direction of the way the train was going, and one foot had left the step, and the other (was) still on the steps and (in the act of) leaving, when the jerk came." This occurrence happened at 10 o'clock a. m.

Another witness for plaintiff states that he was present and saw the train approach the station. Using his own words he says: "I think the train checked up a little, west of the platform, but near it. I do not think the train stopped entirely at the station, this trip. * * I think the train came *nearer stopping that day, than it usually does, to put off the mail.* * * About the time the locomotive got opposite the platform the train was moving very slow."

Another of plaintiff's witness states, using his own language:

"I was at Doylene Station the day that Mr. Walker got his leg broke. I was in about fifteen steps of him when it happened. I saw him when he went to step off the train, and it appeared to me that, as he did so, the train got faster, and jerked his feet from under him. Just before, and at the time he attempted to get off, the train was going slow, and just as he went to step, it appeared to me that it jerked his feet from under him. I do not know that it was going any slower than when thep checked up for the mail. I have never seen any one get off *there* when the train was running as fast as it was then, except Mr. Walker. *I have frequently got on the train* * * *when it was going as fast as that.*"

On the part of the defendant there is not a syllable of *positive* testimony in opposition to these emphatic statements.

The conductor was sworn, and simply stated that " the average rate of running is about twenty-four and one-half miles an hour, on the road from Monroe to Shreveport. This was true in October, 1886. * * The average rate of speed, when passing flag-stations, when the train does not stop, is between eight and twelve miles an hour, for the exchange of mails, as above stated." This witness does not profess to have any knowledge of the occurrence, because he says: "I learned the day afterwards, that Mr. Walker jumped off the train and had broken his leg."

He subsequently volunteered the statement that: "*I judge* that the train was running at about ten miles an hour on that day when it passed Doylene, because it usually passes at that speed when *only* delivering the mail."

The engineer testified that he was on this road, running a passenger engine and train in October, 1886, but that he had "no recollection of the, accident that resulted in the injury of Mr. Walker." Said he did "*not recollect who was engineer on the passenger train going out on the 16th of October,* 1886."

The defendant's third witness was the porter, who states, using his own words: "I recollect the time that Mr. Walker *was said to have been*

*hurt*, at or near Doylene Station." He says further: "I remember that on that day no signal was given to stop at Doylene, and I did not leave my seat."

Consequently, it is established by the concurring statements of defendant's three witnesses — all of them trainmen — that they *knew nothing* of the occurrence, and could testify to nothing adverse to the testimony of plaintiff's witnesses. Of course the mere theoretical conjecture of the engineer as to the *speed* of the train amounts to *nothing at all*.

The recital of the foregoing facts is sufficient to take this case out of the principle announced in Aspell vs. Railroad Company. They plainly show the defendant in fault, and without excuse.

Now I will consider whether they show the plaintiff guilty of contributory negligence to such a degree as to preclude his right to recover.

A review of authorities will first be necessary.

It was decided by the Supreme Court of Tennessee, in 1877, that the act of a passenger in alighting from a train while in slow motion, who sustained injuries in consequence, has been, in the courts of several of the States, treated as negligence *per se*, and no damages can be recovered; "but," say the court, "this is contrary to the current of judicial opinion, in this country, at least. The true rule deducible therefrom is, stated in Wood's Railway Law, Vol. 2, pp. 1130 *et seq*: 'In all cases the question is one of fact, whether in view of particular circumstances, the passenger was guilty of negligence in attempting to leave the train while it was in motion. In this, as in reference to all other matters when the safety of the passenger is concerned, the company owes a duty to the passenger to act with proper caution and care; and *if the motion of the train is not entirely stopped, and the passenger is expressly or impliedly invited to leave the train while moving at a slow rate of speed, he has the right to presume that it is safe for him to do so*, etc. * . * If the train is moving slowly, and there is no *obvious* danger in getting off, it cannot be said to be negligence *per se*, to make the attempt, especially if the passenger is directed to do so * * and it would be error to instruct the jury that such attempt *per se* constituted contributory negligence, Id. 1129.

"*As a rule, it may be said that when a passenger, by the wrongful act of the company, is compelled to choose between leaving the cars while they are moving slowly, or submitting to the inconvenience of being carried by the station when he desires to stop, the company is liable for the consequences of the choice, provided it is not exercised negligently or unreasonably*, Id. 1131, 1132. (Citing Thompson on Carriers, pp. 227, 267; Plopper vs. Railroad Company, 13 Hunn. (N. Y.) 625; Keating vs. Railroad Company, 49 N. Y.

379; and Faber vs. Railroad Company, 70 N. Y. 489, Sections 1131, 1132.) The earlier cases," says the Tennessee court, "established the rule that leaving the train (whilst) in motion, was such negligence as defeated the right of recovery, unless done *to avoid danger of remaining on board*, and this is still stated as the general rule, in many authorities. 2 Wood's Railway Law, p. 1126; Thompson on Carriers, p. 267. But the rule we have laid down is the modern one, formulated from the many exceptions, and this modification has been recognized in this court. Railroad Company vs. Conner, 15 Leca, 258;" Railroad Company vs. Stacker, 86 Pickle 345.

Thus it is stated, on the *highest* authority, that, when a passenger "is *impliedly* invited to leave the train"—not by the *officers* of the train, but by *surrounding circumstances*—"while moving at a slow rate of speed, he has a right to presume that it is safe to do so." But the opinion states, that such an act was but "rash" and "imprudent," because it "was purely voluntary, uninfluenced by any invitation, *expressed or intended by the employes of the company*."

It was decided by the Supreme Court of Georgia, in a recent case, that "the railroad was bound to put a passenger off; to stop its train for this purpose. This it failed to do, and it was not want of ordinary care in the passenger to use the only means to get off, the course of the defendant permitted." Railroad Company vs. McCurdy, 45 Ga. 289; Citing, Filer vs. Railroad Company, 49 N. Y. 47; Lloyd vs. Railroad Company, 53 Mo. 509; Railroad Company vs. Able, 59 Ill. 131.

The Georgia court then states what is the proper limitation of that rule thus: "But, generally, no recovery can be had if the cars are under such motion as to render it *obviously dangerous* for a person to attempt to leave them." (Citing 2 Wood's Railway Law, p. 1136; Railroad Co. vs. Randolph, 53 Ills. 510; Railroad Co. vs. Hazard, 26 Ills. 373.)

"When the *danger is apparent* it must not be braved simply because the company is bound to stop the train, or because it is very important that the passenger should stop at that particular place." 45 Ga. 289, *Ante*.

But the rule is stated concisely in Wood, to be: "But, in all cases, the question of liability must necessarily be determined by the facts and circumstances of each case — whether the train was in rapid motion * * and whether the real danger was obvious." 2 Wood's Railway Law, pp. 1137, 1148.

"But when a railway company *fails to bring its train to a full stop at a station it is liable in damages for injuries sustained by a passenger, in*

*attempting to get off, if, under all the circumstances, it was prudent for him to make the attempt."* *Ibid.* pp. 1148, 1149; Price vs. Railroad Co., 72 Mo. 414; Railroad Co. vs. Letcher, 69 Ala. 106; Railroad Co. vs. Houston, 95 U. S. 297; Railroad Co. vs. Copeland, 61 Ala. 376.

[The italics in preceding quotation are those of the writer.]

Abbott states the rule thus:

" Alighting from a car at an unsuitable place is not contributive negligence, if the train is not stopped at a suitable one, and if there is not such *apparent danger* as would deter a person of ordinary prudence." Abbott's Law of Corporations, vol. 2, p. 598.

Beach announces the rule thus:

" As in the case of boarding a railway train in motion, so it is held not contributory negligence *per se* for a passenger to jump off a train whilst it is moving. Railroad Co. vs. Smith, 59 Texas, 406; Lloyd vs. Railroad Co., 53 Mo. 509; Railroad Co. vs. Kilgore, 32 Penn. St. 292; Brooks vs. Railroad Co., 135 Mass. 21.

" Whether or not a railway company shall be held in damages for injuries sustained by a passenger in attempting to leave one of its trains while in motion, will depend upon whether, under all the circumstances, it was prudent for him to make the attempt." Beach on Contributory Negligence, p. 157, Sec. 53. Citing the following authorities, viz: Price vs. Railway Co., 72 Mo. 414; Doss vs. Railroad Co. 54 Mo. 27; Parish vs. Eden, 62 Wis. 272; Langhoff vs. Railroad Co., 19 Wis. 515; Cuney vs. Railroad Co., 43 Wis. 688; Leovit vs. Railroad Co., 64 Wis. 228; Railroad Co. vs. Pierson, (Ark.) 4 S. W. Rep. 755; 4 S. W. Rep. 52; Railroad Co. vs. Mask, 2 So. Rep. (Miss.) 360; Hunter vs. Railroad Co., 19 N. E. Rep. 820, and many other cases.

In Solomon vs. Railroad Co., 9 N. E. Rep. 430, it was held that to justify a recovery, the act of the defendant " must put the passenger to a sudden election between *alternative danger, or inconvenience, or create some situation which interferred, to some extent, with his free agency,* and was calculated to divert his attention from the danger, and create a confidence that the attempt could be made in safety."

This principle has been frequently maintained and upheld by different courts and notably in the following, viz: Railway Co. vs. Ware, (Ky.) 1 S. W. Rep. 493; Collins vs. Davidson, 19 Fed. Rep. 83; Hoff vs. Railway Co., 14 Fed. Rep. 558; Lawrence vs. Green, (Cal.) 11 Pac. Rep. 750; Railway Co. vs. Miller, (Mich.) 9 N. E. Rep. 841; Railroad Co. vs. Casper, (Ind.) 13 N. E. Rep. 122; Stewart vs. Railroad Co., (Mass.) 16 N. E. Rep. 466; Canal Co. vs. Webster, (Pa. St.) 6 Atlantic Rep. 841; Railway Co. vs. Parsons, (Ark.) 4 S. W. Rep. 755.

The rule was again formulated thus, in Stroud vs. Railroad Co., (Mich.) 31 N. E. Rep. 184 : "In order to make him negligent, he must, as in all other cases, decide upon facts as they appear, as a man of ordinary care would do under similar circumstances. It is not the right of a passenger to run *evident* risks to his safety ; but the rule of prudence binding on him must be that which, under just such circumstances, would restrain all men of ordinary prudence. If the mind of an ordinarily prudent man would be impressed with the belief of danger, he has no right to incur that danger. If the danger would not be apparent, he is not negligent in acting on that assumption."

To this list might be added an almost indefinite number, and variety of cases, to the same effect. But it is quite sufficient to say that, on the faith of those quoted and cited, the following principles are *firmly* established in American jurisprudence, viz :

1. That it is not *per se* negligence on the part of a passenger to alight from a moving train.

2. The question is one of fact whether, under the particular circumstances the passenger was guilty of negligence in attempting to thus alight; and if, it appear that he was not expressly or impliedly invited to leave the train while running at a slow rate of speed by the employes of the train, but was by surrounding circumstances, he has the right to presume that it is safe for him to do so.

3. When a passenger, by the wrongful act of a railroad company is compelled to choose between leaving the cars while they are moving slowly, or submitting to the inconvenience of being carried by the station where he desires to stop, it is liable for the consequences of the choice, provided it is not exercised negligently or unreasonably, and it is not want of ordinary care in the passenger to use the only means to get off, the course of the defendant permitted.

4. To justify a recovery, the act of the company must put the passenger to a sudden election between alternate danger, or inconvenience, or create some situation which interfered, to some extent, with his free agency, and was calculated to divert his attention from the danger, and create a confidence that the attempt could be made in safety.

5. It is the duty of the passenger to exercise his own judgment, and, if the danger was so great that a man of ordinary prudence would not have attempted it, he is guilty of such contributory negligence as bars recovery ; for, when the danger is apparent, it must not be braved, simply because the company is bound to stop the train, or because it is very important that the passenger should stop at a particular place ; but, in all cases, the question of liability must depend

upon whether the train was in rapid motion and the danger obvious — the question being whether, under the circumstances, it was prudent in the passenger to make the attempt to alight, and that depends upon whether the danger was *imminent* and *obvious*.

I, therefore, respectfully submit, that the mere fact of the plaintiff having attempted to alight from defendant's train while in motion, did not constitute his act contributory negligence, because it was voluntary and without an invitation, express or implied, on the part of the company's employes.

The act of the company put the plaintiff to a sudden election between alternative danger, or inconvenience, and thus created a situation well calculated to divert his attention from that danger, and inspired a confidence in the safety of his attempt to alight therefrom. The danger does not appear to have been either apparent or imminent.

I think the verdict of the jury and the judgment of the court should have been affirmed.

As was appropriately said in Williams vs. Pullman Palace Car Company, 40 Ann. 420, in deciding a kindred question : "This court should seek to place its rulings and jurisprudence in line, and in harmony with those of the Supreme Court of the United States, and of the courts of last resort of our sister States, whenever those decisions do not militate against the principles of our special and exceptional system of laws;" and it is in this spirit I have prepared this elaborate dissent, and in the hope of attaining this end that I place my views on record.