## The Pennsylvania Railroad Company *v.* Zebe *et ux.*

It is error to omit or refuse to give a distinct and substantial answer to a point that is relevant and material to the issue.

A railroad company that has provided a sufficient platform for the egress of passengers from their cars, is not liable for injuries to a passenger sustained in consequence of his voluntarily leaving them on the opposite side and stepping on the other track, instead of on the platform.

The company is not liable in such case, unless there were gross negligence on their part, in permitting the passenger thus to leave the car.

If a passenger be injured in consequence of his disregard of the necessary regulations of the company, in regard to the mode of alighting from their cars, they are not liable, even though the negligence of their servants concurred in causing the mischief.

Under the Act 26th April 1855, the damages to be recovered by the surviving relatives for an injury resulting in death, are confined to such as are capable of a pecuniary estimate; nothing is to be allowed for the mental sufferings of the survivors, or the corporal sufferings of the injured party.

In case of the loss of a minor son, the measure of damages is the pecuniary value of his services during his minority.

It is error to instruct the jury that, in such case, the question of damages is one entirely for them.

Error to the District Court of *Westmoreland county.*

This was an action on the case by Nicholas Zebe and Elizabeth his wife, against The Pennsylvania Railroad Company, to recover compensation for the death of their son Peter Zebe, who was killed on the defendant's railroad.

In September 1856, Nicholas Zebe and his son Peter, aged twelve years, took passage in the cars of the Pennsylvania Railroad Company, from Irwin's Station, in Westmoreland county, to Brinton's Station, in Allegheny county. On arriving at the latter point, the plaintiff and his son, instead of alighting on the platform provided by the company for that purpose, left the cars on the opposite side, and stepped upon the other track, where the boy was struck by the locomotive of a freight train coming east, and instantly killed. And for this the present action was brought.

The court below (Buffington, P. J.) delivered the following charge to the jury:—

"This is a special action on the case to recover damages alleged to be sustained by the plaintiffs from the loss of their child, a boy about twelve or thirteen years of age. The allegation is, that the boy was a passenger on board of the accommodation train from Irwin's Station to Brinton's Station, on the defendant's road; and that on leaving the train at the latter place, he met with his death by means of the carelessness and negligence of the agents of the company. By the common law, this action could not have been sustained, as the parent had no such property in a child as would

[The Pennsylvania Railroad Company *v.* Zebe *et ux.*]

enable him to maintain an action for his death; but by an Act of Assembly, passed on the 15th of April 1851, 'whenever death shall be occasioned by unlawful violence or negligence,' his representatives 'may maintain an action for, and recover damages for the death thus occasioned,' and that right by a subsequent act is extended to the parents.

"The right of action, therefore, is when death has been occasioned by 'unlawful violence or negligence.' This act would seem to divide the right of recovery into two distinct causes of action—the first, 'unlawful violence,' and the second, 'negligence.' The object of the act would appear to be, not to alter or diminish or increase the liability of a person charged with negligence, but simply to give a cause of action, where death ensued, which did not exist before.

"We are, therefore, to recur to the common law to ascertain the liability of the defendants in this case. By that rule of action, carriers of passengers on railroads are bound to the utmost care and skill—all their machinery must be in good order, and their agents skilful and diligent. If an accident occurs while a passenger is on the train, the law presumes that it was caused by the carelessness of the employees on the road. But this rule of presumption only applies where the passenger is on the train, and not to one that occurs after he has left the cars. But although the presumption of the law is such, yet it is competent to show that, even in such a case, the road or its agents were in no fault.

"It is further a settled rule of law, that where an accident has occurred by reason of the carelessness, rashness, or imprudence of the plaintiff himself, he has only to blame his own conduct, and he cannot recover.

"It is equally well settled, that where the accident is the result of the imprudence and negligence of the plaintiff and the defendant both, where the carelessness of the party injured contributed to the injury, although the other party may also have been in fault, in such case there could be no recovery; where parties are in equal fault, there is no cause of action.

"In the present case, the facts proved would seem to show, that in the month of August or September 1856, the plaintiff and his son took passage in the train, paid their passage and entitled themselves to all the rights of passengers, to be let off at Brinton's Station. They were carried safely to the point agreed upon. The railroad, at the latter place, consisted of two tracks. The accommodation train running west, on which the plaintiff was a passenger, ran upon the north track, leaving the south track for the freight trains coming east. The schedule, if the jury believe the evidence, required the accommodation train to be at Brinton's, at ten minutes past eight o'clock, and also that the freight train should be there at the same time. To accommodate passengers getting

off at Brinton's, there was a platform on the north side, for those passengers leaving the train going west, *and* also a platform on the south side of the south track, for those getting off the trains coming east. The accommodation train arrived there at the schedule time—and here there is some discrepancy in the evidence; *some of* the witnesses say the plaintiffs were inside of the cars till they stopped, and that the train was standing when they left; others say they were on the platform of the front car at the time the train arrived, and had been there for some time before the train came to the station; and some witnesses prove that plaintiffs got off before the train stopped. Was there any carelessness, at this point of time, in the accommodation train? It seems to the court there is no evidence of that. Were the necessary platform and accommodations provided there for the safety of passengers? If so, then the company had done all that could be required of them, so far as the passenger train was concerned. What then was it the duty of the plaintiffs to do? Could they, with safety, leave the train before it stopped? At what time, did they leave the train? This is a question purely for the jury. If they got off before it stopped, it cannot be doubted but their safety was endangered, and that they were rash and careless. If they did so get off, did that contribute to the accident? If so, and that act was careless and rash, they cannot recover. It was their duty to wait till the train stopped—and their disregard of that, was an act of carelessness. If, however, the jury believe they did not leave the train before stoppage, then, of course, in this, there was no negligence or carelessness.

" What next was it their duty to do? Had they an equal right to get off either on the one side or the other? or was it their duty, in view of all the circumstances, to get off on the platform? This is a question for the jury. If it was their duty to get off on the station platform, and they neglected or disregarded that duty, but got off on the side next to the other track, which was, no doubt, the cause of the injury—then certainly their own careless act was the cause of the injury, and they cannot recover. If, however, the jury believe they had a right to get off on that side, and they violated no duty in doing so, then no carelessness could be attributed to them.

" But, suppose the plaintiffs did everything that prudent passengers are expected to do. In what is it alleged that the defendants were negligent? If the evidence is believed, the accommodation train was in no fault. What, then, caused the injury? It was not that train, but another freight train coming east. Was there negligence in the agents of the company on that train? If so, in what did it consist? It was running on schedule time, at a slow rate, was whistling, and ringing the bell, as it approached. There is no sufficient evidence to justify a conclusion of negligence

in that train. In what, then, did the negligence consist? It is alleged that the trains ought not to meet at a station; and that the very fact of their meeting there is carelessness. We do not think so, for the reasons stated in our answer to the first point of plaintiff. It seems to the court that the evidence to charge the defendants with negligence, in this case, is very slight; still, the facts connected with the stoppage of the train, being contradictory, and the conclusion of negligence, under all the circumstances, being one of fact, is left to the jury.

"If the jury find for the plaintiff, the question of damages is one for the jury entirely."

The defendant's counsel presented the following points, upon which he requested the learned judge to charge the jury:—

1. That the deceased, having been killed on the track of the railroad, where he had voluntarily placed himself, this action cannot be maintained, unless there was such gross and wanton negligence, as would be equivalent to *dolus malus*, and voluntary injury.

Answer.—"The facts in this case show that the plaintiffs were passengers in the train, and, as such, it was not only the duty of the company to carry them safely, but to enable them to leave the cars with safety to their persons. If they left the train in the usual way, and were properly regardful of their own safety, and did everything that their own duty required of them, and in thus leaving the train, and before they found a place of safety, they were injured by the negligence of the company, then, we think, that passengers in that condition, although separated from the train, would have a right to recover for such negligence. This is not the case of a stranger unconnected with the train, voluntarily placing himself on the track."

2. That when the deceased left the car, he ceased to be a passenger, and the liability of the defendants, as common carriers, ended; and having been killed after this, this action cannot be sustained, unless the death was the result of gross negligence and wanton injury.

Answer.—"This point is answered in our answer to the first point of defendant as above."

3. That the company having provided a safe mode of egress, and proper landing platform and station, and the deceased having voluntarily chosen to go from the car on another side, and where he was on a track of the road parallel to that on which was the car in which he had been a passenger; and having by reason of this, his voluntary conduct, met his death, this action cannot be sustained.

Answer.—"The truth of the facts stated in this point is for the jury. We have substantially answered this point in our general charge. If the facts, which the jury believe, prove that the plaintiffs disregarded their own safety and duty, by getting off when

they ought not to have left, and by this means caused the accident, or contributed to it, then they cannot recover.   But, if they had a right, in the estimation of the jury, to leave on either side, and they are satisfied from the evidence, that it was caused by the carelessness of the company, or their agents, the plaintiffs may recover."

4. That as a common carrier, the defendant was bound only to provide for the safe transportation of passengers, and their safe egress from the line of the road; and that the defendant, in this instance, having done so, and the person killed did not avail himself of it, but left the train at an improper time, and in an improper way, was not under the protection of the company any longer than he was on the train, and the accident occurring afterwards, by his own negligence, the plaintiffs cannot recover.

Answer.—" This point is answered in our general charge, and in our answer to the foregoing points.   The truth of the facts is for the jury."

To this charge the defendant excepted; and a verdict and judgment having been rendered for the plaintiffs for $1500, the defendant removed the cause to this court, and here, *inter alia,* assigned the same for error.

*W. A. Stokes,* for the plaintiff in error.

*Cowan,* for the defendants in error.

The opinion of the court was delivered by

THOMPSON, J.—This was an action, brought by defendants in error and plaintiffs below, against the railroad company, for negligently causing the death of their son, whom, with his father, they had conveyed in their cars from Irwin's Station, in Westmoreland county, to Brinton's Station, in Allegheny county, where he was killed on the track of the company's road by being run over by the train going east.   The gravamen of the charge in the plaintiff's *narr.* is, that " the company did not use due care, diligence, and skill in allowing the said Peter Zebe time and opportunity to get off and away from the said cars when they arrived at Brinton's Station, but on the contrary, immediately on the arrival at said station, and before the said Peter had time to get away from the said cars, the said company carelessly and negligently caused an engine or locomotive to be run alongside of the said cars, which said Peter was attempting to leave, so that the said engine or locomotive caught the said Peter," and passing over him, he was killed.

The case involved questions of negligence on the part of the company as to proper conveniences for the exit of passengers from the train, and also on part of the plaintiff and the deceased

[The Pennsylvania Railroad Company *v.* Zebe *et ux.*]

in the act of leaving the cars; and also whether the accident occurred before or after the relation of carrier and passenger had ceased or not.

There seems to have been no controversy about two facts in the case:—1. That the company had a convenient platform at the station, for passengers to leave the cars upon, going west: 2. That the deceased and his father, instead of leaving the car by passing on to the platform, left it on the other side, which brought them immediately, on reaching the ground, on the other or southern track of the road, where the boy was killed.

The plaintiff in error complains that several points put by them, calculated and intended to present their views on the question of their liability, were not sufficiently answered by the court, so as to give the advantage and benefits which they claim the law would give them under the facts in the case. The first assignment of error is, that the court did not distinctly and explicitly answer their first point.

It cannot be denied, after the many decisions upon the question, that an omission or refusal to answer a point put by a party, relevant and material to the issue, is error: 1 *S. & R.* 449; 2 *Id.* 298; 6 *W. & S.* 58; 3 *Penn. R.* 318, and in Hood *v.* Hood, decided at this term, wherein the doctrine is elaborately examined. The law of the courts requires points put, to be substantially answered, 3 *Barr* 244, provided always, that they are relevant, and not unconnected with the facts in the case: 12 *Harris* 72. There have been many cases in which answers have been condemned for want of sufficient perspicuity or conciseness, and this shows the importance of preserving the rule that requires of the judge full and substantial answers to the points. In fact, the importance of the rule cannot be over-estimated, when we regard our short and simple pleading, which rarely brings the law of the case on the record. The only method, in most cases, a party has left to bring before the court, and from thence to this court for review, a proposition of law, is by presenting it as a point to be charged upon, and when clearly responded to, it greatly aids the jury in coming to conclusions in the case; or, if distinctly negatived, the party has no trouble in having it reviewed. It is, therefore, necessary that the point, if relevant, be substantially answered, otherwise it will be error. The qualification of the rule to relevancy excludes, of course, abstract propositions, or such as, if answered as prayed for, would not have benefited the party.

In looking into the testimony in the present case, we think there was sufficient evidence to authorize the defendants to ask for instructions on the effect of it, as regards the act of the plaintiff and the deceased in leaving the cars, and placing themselves on the south track of the road. If they did voluntarily and negligently place themselves there, when there was a safe place of exit,

and full opportunity to make it, surely the defendants would not be liable as common carriers, if, instead of leaving by the usual mode of stepping on the platform, they negligently and voluntarily placed themselves on the other track. This was the law of the plaintiffs' point. It is true, it was faulty in the assumption of the facts of which it was predicated. But as to this no objection was made by the court, and a distinct answer was not refused for this reason, nor could it well have been for such a reason, as it was capable of as distinct an answer on the law, giving at the same time the facts to the jury, as if it had been hypothetical in form. It should have been as distinctly answered, if answered at all, as if put hypothetically. But it was not, and we do not find it sufficiently affirmed, in relation to the facts on which it was based, in any part of the charge. True, it might be deduced from observations in other connections, and relations to other facts. But this is not quite enough. It ought to have been answered in the relation in which it was put, somewhere. The party was entitled to this. The jury could not, without much greater skill in construing language than generally falls to their lot, have told whether the point was affirmed or negatived.

The point asserted immunity to the company, if the plaintiff and his son voluntarily placed themselves on the other track of the road, unless in case of gross negligence on part of the company. The answer, instead of affirming this, if the facts were true, treated of the duty of the company to convey safely, and to provide a safe mode of exit from the cars, and added, " if they left the train in the usual way and were properly regardful of their own safety, and did everything their own duty required of them, and in thus leaving the train, and before they found a place of safety, they were injured by the negligence of the company, then we think that passengers in that condition, although separated from the train, would have a right to recover for such negligence. This is not the case of a stranger unconnected with the train, placing himself voluntarily on the track." This was clearly an insufficient answer ; in fact, in addition to the just complaint of insufficiency, it introduced an element which it is difficult to tell the effect of in such a case, and that was in leaving it to be inferred that there was no place of safety provided for leaving the cars, for the court say, if " they did everything that duty required of them in thus leaving the train, and before they found a *place of safety,*" they were injured by the negligence of the company, a recovery might be had. From this language, a jury might have inferred, and perhaps did, that acting as carefully as they could, there was no place of safety provided for leaving the cars. An intimation like this, although not intended, might have a very mischievous effect. This assignment of error, we think, is sustained.

2. The second assignment, like the first, is to the insufficiency of the answer to defendant's second point.  This point asserted the principle that if the accident occurred after the plaintiff and deceased had left the cars, the liability of common carriers was ended, and having been killed after this, the action could not be sustained, unless the death was the result of gross negligence or wanton injury.  There was sufficient testimony in the case to justify the defendant in making the point, and the court should have given a distinct response to it, although, like the last one, it was faulty in form.  Notwithstanding this, the court essayed an answer by saying, "this point is answered in our answer to the first point of the defendant as above."  How answered, affirmatively or negatively?  We cannot say, and we think a jury could not have derived much instruction from it.  As we have already said, the party was entitled, either directly in answer to this point, or in the body of the charge, to a distinct response to the proposition.  The gravamen of the complaint was against the defendants as common carriers, and as such they were counted against.  If this relation had ended when the accident occurred, the plaintiffs could not have recovered, and the evidence shows this to have been a debatable point in the case.  A very different rule of responsibility exists, where such an accident occurs during the continuance of the relation of common carriers, and after it has entirely ended.  And it was important that the jury should have been instructed clearly as to this, so that they might not disregard the distinction, upon the idea that the company were answerable at all events, under the evidence, and that the objection was merely technical.  Special care is the duty of the court in all cases, where there is much to excite sympathy, and lead away the judgment from the application of well settled principles of law.  Adherence to these principles under all circumstances, is the only security we can have.  A disregard of them is an injury to the people, by rendering less secure the safeguards of the law upon which all must rely in the hour of trouble.  We think the answer was insufficient.

The fifth, sixth, seventh, eighth, and tenth assignments of error may be considered together.  In their third and fourth points, the plaintiffs in error prayed the court to charge, that as common carriers, they were only bound to provide for the safe transportation of passengers, and for their safe egress from the line of the road, and if, in this instance, they had done so, and if the plaintiff and the deceased did not avail themselves of the mode of exit provided, but left at an improper time, or by an improper way, the protection of the company ceased, and if the accident occurred in consequence of this, it was the result of the risk voluntarily assumed by them, and being guilty of negligence themselves, they cannot recover.

[The Pennsylvania Railroad Company v. Zebe *et ux.*]

In response to these prayers for instructions, the court very properly left the fact to the determination of the jury, whether the company had provided a safe means of transportation and the necessary platform accommodations for the safe exit or discharge of passengers, adding, "if so, then the company had done all that could be required of them, so far as the passenger train was concerned." This was all very right; but, following this instruction, the court submitted another inquiry to the jury which, it seems to me, was inconsistent with the clear idea thus expressed; and that was, whether the plaintiff and the deceased had "an equal right to get off the cars on the one side or the other, or was it their duty, in view of all these circumstances, to get off on the platform." And again, "if the jury believe they had a right to get off on that side, the opposite side to the platform," and they violated no duty in doing so, then no carelessness could be attributed to them.

The law implies in the contract of carrying passengers by railroad companies, that they shall provide a safe and sufficient road and cars, competent and careful conductors and hands, and safe and convenient means of egress and regress to and from the line of their road. There must be no negligence on their part. There is also on part of the passenger an implied contract, that he will and does "assent to all the company's reasonable rules and regulations for entering, occupying, and *leaving their cars*, and if injury befall him by reason of his disregard of regulations which are necessary to the conducting of the business, the company are not liable in damages, even though the negligence of their servants concurred with his own negligence in causing the mischief:" Sullivan v. The Philadelphia and Reading Railroad Company, 6 *Casey* 234, *per* WOODWARD, J. Here are reciprocal duties defined, resting upon principles most reasonable, and of the clearest justice, and nothing but special circumstances, or the most pressing exigencies, which are not now foreseen, could justify a departure from them. Nothing of the kind marked the case in hand. But the court submitted the question to the jury, whether the parties in this case had not a right to leave the cars, either by the safe means provided by the company, or by a way not provided. The abstract question of their right to do so, is one thing, and need not be disputed; but the liability of the company by reason of their doing so is quite another thing. The regulation of the company for leaving the cars by the platform, was apparent from its existence, and having been placed there and used for the purpose. This was the usual egress from the train. Without proof of any necessity, coupled with the proposition of their right to leave the cars at either side, the jury were, by the instruction of the court, allowed to find on the opposite of the principle laid down in the case of Sullivan v. The Philadelphia and Reading Railroad Company,

[The Pennsylvania Railroad Company *v.* Zebe *et ux.*]

which declares that passengers are bound to conform to the regulations of the company on "entering, occupying, and leaving the cars." The duty being fixed by the relation of the parties to each other, the contract must be performed by both. A departure by either could be justified only by a paramount necessity. The question then for the jury should have been, first, as to the performance of the duty by the company in providing safe cars and safe means of egress from them; and, secondly, if this were so, was it the fault of the company that the injury occurred? and to establish this, more was necessary to be proven than that the plaintiff and the injured son voluntarily chose to depart from the cars by an unusual way. There should have been proof of some existing necessity for their doing so, to excuse them from negligence, and the consequences of it. Then, the question might have been left to the jury, as to the propriety of their violating the regulations of the company. A voluntary disregard of regulations providing for their safe exit by the platform, was a disregard of their obligations to the company; and if this were so, the plaintiffs ought not to recover. We hold, on these principles, that the company's liability could not be fixed for the injury consequent on a choice of the passenger, in disregard of the provisions made by them for his safety and convenience. It was, we think, error in the court to submit the question of the rights of the parties to leave the cars at either side, in the absence of the proof of a justifying necessity in doing so. It was not negligence on part of the company that they did not by force or barriers prevent the parties from leaving at the wrong side. People are not to be treated like cattle; they are presumed to act reasonably in all given contingencies, and the company have no reason to expect anything else in this case. There was error in this portion of the charge.

The eleventh assignment of error regards the question of damages. The court instructed the jury on this subject by saying, "If the jury find for the plaintiff, the question is one for the jury entirely." There was no prayer for instructions. Yet this will not prevent a party dissatisfied with the charge, from having it reviewed, and errors corrected, if they exist, in the charge as given. It is obvious, that this general and unrestricted reference of the question of damages to the jury, gave them the fullest latitude of construction in assessing them. It left them to base that assessment upon such standard as each juror might set up for himself, or any common one that might happen to suit the feelings, tastes, or judgment of all, in the particular case, never again, perhaps, to be the rule in any future case, however similar in circumstances. Rights should be better defined. And although, from the inherent difficulty in estimating the value of life, when called upon to compensate for its loss, we cannot lay down what may properly be called rules, to guide in making the estimate, yet it is

our duty to announce such principles of compensation as we think the legislature intended by the act in question, that there may be some approximation to uniformity of results in such cases.

The Act of the 15th of April 1851 provides, "that whenever death shall be occasioned by unlawful violence or negligence, and no suit for damages be brought by the party injured during his or her life, the widow of such deceased, or if there be no widow, the personal representatives, may maintain an action for, and recover damages for the death thus occasioned." The Act of the 26th of April 1855 changed the law, so far as the personal representatives were concerned, and conferred the right of recovery only upon parents for the loss of children, and upon children for the loss of parents, and reciprocally upon husband and wife. These acts confer new rights unknown to the common law. It existed in the civil law, and was an institution of the old Saxon code; so too, is it to by found in the Scottish law, under the head of "Assythements for Homicide." But as the compensation under all these laws rested upon very precise regulations, generally, peculiarly applicable to the times, circumstances, estates, and conditions of the deceased and the parties entitled, we derive no light from them.

In 1846, the statute of 9 & 10 Vict. cap. 93, was passed in England, providing for the recovery of damages, "whensoever the death of a person shall be caused by wrongful act, neglect, or default," against the party occasioning the same. The damages, it has been held, are for the *death* of the party, as it is with us. Under this statute, providing for compensation for the same thing as does ours, namely, the death of the decedent, we have one case which turns on the subject of the rule of damages. It is the case of Blake *v.* Midland Railway Company, 10 *Eng. L. & Eq. R.* 437. The case had been tried before Baron PARKE, at Derbyshire Assizes, and came before the Queen's Bench in banc, on a rule to show cause why a new trial should not be granted, on the ground of misdirection in regard to the principle upon which damages should have been assessed. In granting the new trial, the doctrine is held that the jury, in estimating damages under that statute, "are to be confined to injuries, of which a pecuniary estimate can be made, and cannot take into consideration the mental suffering occasioned to the survivors by the death," and that nothing may be allowed as *solatium*, that being incapable of a pecuniary estimate, nor for the sufferings of the injured party.*

The difficulty of estimating the value of the life and the consequent damage to the survivors in the loss of it, is conceded in the case, but the reasoning of the learned judge is forcible in

---

* See also Franklin *v.* The South-eastern Railway Company, 3 *H. & Norm.* 211; Dalton *v.* South-eastern Railway Company, 4 *Jurist, N. S.* 227; Bramall *v.* Lees, 29 *Law Times R.* 111; Duckworth *v.* Johnson, 7 *Am. L. R.* 630.

[The Pennsylvania Railroad Company v. Zebe et ux.]

illustrating the greater difficulty which would have to be encountered in estimating damages for what cannot be measured by any pecuniary standard, such as grief, loss of society, and the thousand nameless things which make up the estimate in which the deceased may have been held by the survivors entitled to damage under the law. And hence the conclusion, that the provision giving damages for the death, was only such as could be tested by a pecuniary estimate not speculative or fanciful. "The measure of damage," said the learned judge, "is not the loss or suffering of the deceased, but the injury resulting from his death to his family." Our statute, although differing, in the absence of details, from the British statute, is a provision for compensating precisely the same sort of injury, the damage occasioned to the survivor by the death of the decedent, and hence we may avail ourselves of the light shed upon the subject by the learned court in the case cited.

In England, under this construction of their statute, damages seldom exceed one or two hundred pounds sterling. One great merit in the rule, and what undoubtedly was the legislative intent there, as with us, is, that it is a rule of equality, compensating the rich and poor, the refined and cultivated, and those less so, by the simple standard of pecuniary loss.

The case of The Pennsylvania Railroad Company v. McCloskey's Administrator, 11 *Harris* 526, while it adheres to the rule of giving damages only upon such bases as are susceptible of a pecuniary estimate, seems to regard the value of the life lost as the basis of the estimate, rather than the injury resulting from it to the survivor entitled to sue. This conclusion flowed from the form of, and parties to, the action, and naturally led to the result. It was a suit by the personal representatives, for the benefit of the estate. Treated in this light, and as the plaintiffs, the administrators, were not damaged by the death, but were recovering for the estate, the only estimate, it seems to me, that could be made was of the value of the life. The wrong done to it survived by virtue of the statute to the estate, and gave the personal representatives their right of recovery co-extensively with its value. But for some reason—a wise one, of course—this law was in 1855 altered, and the right to sue was conferred on parents for the loss of children, and children for parents, and reciprocally between husband and wife. This was a new and independent right given by positive law—not cast upon them by survivorship as for an injury to the decedent. It is for the wrong done to them. In this view of the law, we think the rule which should have been observed in this case differs from that in The Pennsylvania Railroad Company v. McCloskey's Administrator, and more resembles the case of a father suing for injury to his child. In the case of The Pennsylvania Railroad Company v. Kelly, 7 *Casey* 372, the rule of damages in such a case was

[The Pennsylvania Railroad Company *v.* Zebe *et ux.*]

considered, and in delivering the opinion of the court, Mr. Justice WOODWARD says, " the damages must be compensatory merely, and that compensation must have regard to the plaintiff's loss of his services, and to the expense of nursing and medical treatment." " The father was entitled to the services of his child during minority, and by just so much as this injury impaired the value of this right was he entitled to compensatory damages," and it was added, " that it was proper for the jury to understand that the suffering endured by the boy, and the disfiguration of his form, and whatever was merely personal to him, should not enter into the father's damages, because for them the son would have a right of action." This is a rule of damage on a very kindred subject, and is scarcely distinguishable from cases like the present, except in extent of injury, and is, in essence, the principle of the cases already cited.

From the authorities and reasons given, the jury, instead of the unrestrained license given them in the charge, in the assessment of the damages, should have been instructed that, if the plaintiffs were entitled to recover, it was for the damage done in producing the death of the son, and that this was to be estimated by the pecuniary value to them of his services during his minority, together with expenses of care and attention to the deceased, arising out of the injury, funeral expenses, and medical services, if any. This is the only pecuniary damage done to them, and this the law allows them to recover, if entitled on the facts to recover at all. This excludes damages for the suffering of the deceased, which was personal to himself, and did not survive, as well as for solace, which are incapable of appreciation, so as to be compensated. No money could be the measure of the affliction. No road, great or small, but would fall beneath the weight of such a rule, if applied; and for an injury happening by a mere oversight, amounting, of course, to negligence, by some agent in the transit of the cars, it would be a severe penalty to visit the company with extravagant and exterminating damages. But they should be held to a strict accountability to the extent that a fair interpretation of the statute will allow. In making the estimate of the value of the life and consequent damage by the death, much is still left to the sound discretion of the jury. Whatever is susceptible of a pecuniary estimate is included within it, and what we have seen was not to be included, must be excluded.

We are speaking only of cases of death by negligence, unaccompanied by wantonness, violence, or gross negligence evincive of moral turpitude. In such cases, no doubt, but merely compensatory damages may be exceeded. It is not intended to vary the rule on this subject, existing in case of other personal wrongs, but leave it with such attendant circumstances to the sound discretion of courts and juries.

The thirteenth assignment of error is to the rejection of Shattuck as a witness. We are not convinced that there was error in this ruling—nor is it material to decide the matter—for as the case goes back for a re-trial, the company will perhaps think it their duty to avoid an exception on this ground by executing a release to him.

The other assignments of error not noticed are not sustained; but, for the reasons given, this judgment must be reversed.

Judgment reversed, and a *venire de novo* awarded.